United States District Court
for the
Eastern District of New York

ARCPE HOLDING LLC,                      )
                                        )
                    Plaintiff,          )
                                        )
                                        )
                                        )
                                        )        Civil Action No.
vs.                                     )
                                        )        **COMPLAINT**
9Q4U5E LLC, ALEXANDER T. DATOR          )
A/K/A ALEXANDER DATOR, CHASE            )
MANHATTAN MORTGAGE CORP.,               )
DISCOVER   BANK,    BANK    OF          )
AMERICA, N.A., NEW YORK CITY            )
ENVIRONMENTAL CONTROL BOARD,            )
JOHN DOE (Those unknown tenants,        )
occupants, persons or corporations or their )
heirs, distributees, executors, administrators, )
trustees, guardians, assignees, creditors or )
successors  claiming  an  interest  in  the )
mortgaged premises.)                     )
                                        )
                    Defendants.

Plaintiff, by its attorneys Hasbani & Light P.C., for its complaint against the Defendants alleges as follows:

## INTRODUCTION

1.      This action is brought pursuant to New York Real Property Actions and Proceeding Law (RPAPL) Article 13, to foreclose a Mortgage encumbering 83-17 Britton Ave. Flushing N.Y. 11373 a/k/a 83-17 Britton Ave. Elmhurst, N.Y. 11373 , together with the land, buildings, and other improvements located on the Property ("Property").  The legal description of the Property is attached as Schedule B.

## PARTIES

2.      The Plaintiff is a single member Florida limited liability company located at 1900 Sunset Harbour Drive, 2nd Floor, Miami Beach, FL 33139. The single member is a resident of the State of Florida. Plaintiff is the owner and holder of the subject Note and Mortgage or has been delegated authority to institute this Mortgage foreclosure action by the owner and holder of the subject Note and Mortgage.  Attached here as Schedule A is a copy of the original note.

3.     Defendant 9Q4U5E LLC is a New York limited liability company with a principal place of business at 70-39 67th Pl. Ridgewood New York 11385 and is the owner of the Property.

4.  Defendant Alexander T. Dator a/k/a Alexander Dator is a citizen of New York and the obligor on the subject mortgage.

5.  Defendant Chase Manhattan Mortgage Corp. has a principal place of business located in New York and is the holder of a lien encumbering the property, which is subject and subordinate to Plaintiff's mortgage.

6.  Defendant Discover Bank has a principal place of business located in the State of Delaware and is the holder of a lien encumbering the property, which is subject and subordinate to Plaintiff's mortgage.

7.     Defendant Bank of America, N.A. has a principal place of business located in North Carolina. Bank of America N.A. is being named as a party defendant because of a fraudulent satisfaction of mortgage executed on behalf of Bank of America.

8.  Defendant New York City Environmental Control Board is a city agency existing under the laws of New York with its principal place of business in New York and is the holder of a lien encumbering the property, which is subject and subordinate to Plaintiff's mortgage

9.  The Defendants claim an interest or lien encumbering the Property, which is either subordinate to Plaintiff's Mortgage, or paid in full, equitably subordinated, or adverse to Plaintiff's Mortgage.  The interest or lien of each defendant is attached as Schedule C.

10. The interest or lien of any governmental entity is attached as Schedule D.

## STATEMENT OF JURISDICTION

11.     Federal subject matter jurisdiction exists pursuant to 28 USC Section 1332 because complete diversity exists among the Plaintiff and the Defendant and the amount in controversy, without interest and costs, exceeds the $75,000.00.

## VENUE

12.     Venue is proper pursuant to 28 USC Section 1391 because the Property is located in this District and a substantial part of the events and omissions giving rise to this action occurred in this District.

## FACTUAL BACKGROUND

13.     On or about June 8, 2007, Alexander Dator executed and delivered a Note whereby he promised to pay the sum of $96,700.00 plus interest on the unpaid amount due.

14.     As security for the payment of the Note Alexander Dator executed and delivered a Mortgage, in the amount of $96,700.00 which was recorded as follows.

Recording Date: June 28, 2007
CRFN: 2007000334390
City Register of New York, Queens County

15.     The mortgage was subsequently assigned to Liquidation Properties Inc.

16.     The mortgage was subsequently assigned to ARCPE HOLDING LLC.

17.     Alexander Dator failed to make payment in accordance with the terms of the Note and Mortgage by not making the payment that was due on December 1, 2013 and subsequent payments. Accordingly, Plaintiff hereby accelerates the payments and declares due the entire amount owed on the Note and secured by the Mortgage.

18.     There is now due and owing on the Note and Mortgage the following amounts:

Principal Balance: $96,305.65
Interest Rate: 5.25%
Date Interest Accrues from: November 1, 2013

together with late charges, monies advanced for taxes, assessments, insurance, maintenance, and preservation of the Property, and the costs, allowances, expenses of sale, and reasonable attorney's fees for the foreclosure.

19.     In order to protect the value of the Property and its rights in the Property, the Plaintiff may have to pay taxes, assessments, water charges, insurance premiums, and other charges. Plaintiff requests that any amount it pays, together with interest, be included in the total amount due.

20.     Plaintiff has complied with the notice provision of the Mortgage and filed the information required by RPAPL Section 1306. The Mortgage was originated in compliance with all provisions of Section 595-a of the New York Banking Law and any rules or regulations promulgated thereunder, and, if applicable, Sections 6-l or 6-m of the Banking Law.

21.     No action was brought to recover any part of the Mortgage debt or if any such action is pending final judgment for Plaintiff was not rendered and it is the intent of the Plaintiff to discontinue it.

## AS AND FOR A SECOND CAUSE OF ACTION

21.     Plaintiff repeats and reiterates each and every allegation of the complaint in the paragraphs "1" through "20" with the same force and effect as if set forth herein.

22.    That the Subject Mortgage was not satisfied but was assigned to ARCPE HOLDING LLC by Assignment of Mortgage dated August 21, 2018; and upon information and belief said mortgage is still unpaid.

23.    That pursuant to Real Property Actions and Proceedings Law (RPAPL) Article 15, Plaintiff is entitled to an Order declaring the Subject Mortgage a valid and existing lien and encumbrance against the subject premises, Nunc Pro Tunc, from February 28, 2019.

## AS AND FOR A THIRD CAUSE OF ACTION

24.    Plaintiff hereby repeats and alleges, and incorporates the allegations set forth in paragraphs "1" through "23" of this Complaint, as if fully set forth herein at length.

25.    That this action is brought in part pursuant to Article 15 of the Real Property Actions and Proceedings Law.

26.    An Assignment of Mortgage from ARCPE Holding LLC to Bank of America N.A. dated February 8, 2019 was recorded on February 12, 2019 in CRFN: 2019000048290. Said assignment was fraudulently created and recorded. ARCPE Holding LLC has not assigned this loan to Bank of America N.A. or any other entity.

27.    The Assignment of Mortgage should be canceled and expunged from the City Register of the City of New York, Queens County.

28.    That Pursuant to RPAPL Article 15 Plaintiff is entitled to an Order discharging and cancelling the fraudulently executed and recorded Assignment of Mortgage from the public records.

29. Further, pursuant to RPAPL Article 15 Plaintiff is entitled to an Order compelling the City Register of New York, Queens County upon payment of its requisite fees, to record a certified copy of the Order discharging and cancelling said Assignment of Mortgage from the public records.

## AS AND FOR A FOURTH CAUSE OF ACTION

30.    Plaintiff hereby repeats and alleges, and incorporates the allegations set forth in paragraphs "1" through "29" of this Complaint, as if fully set forth herein at length.

31.    That this action is brought in part pursuant to Article 15 of the Real Property Actions and Proceedings Law.

32.    A Full Discharge of mortgage dated February 28, 2019 was recorded on March 1, 2019 in CRFN: 2019000068627.  Said Discharge was fraudulently created and recorded.

33.      The Discharge of Mortgage should be canceled and expunged from the City Register of the City of New York, Queens County.

34.   That Pursuant to RPAPL Article 15 Plaintiff is entitled to an Order discharging and cancelling the fraudulently executed and recorded Discharge of Mortgage from the public records.

35. Further, pursuant to RPAPL Article 15 Plaintiff is entitled to an Order compelling the City Register of New York, Queens County upon payment of its requisite fees, to record a certified copy of the Order discharging and cancelling said Discharge of Mortgage from the public records.

36. That Plaintiff has no other adequate remedy at law.

WHEREFORE, PLAINTIFF DEMANDS:

a. Judgment determining the amount due Plaintiff for principal, interest, late charges, taxes, assessments, insurance, maintenance and preservation of the Property and other similar charges, together with costs, allowances, expenses of sale, reasonable attorney's fees, all with interest;
b. A referee be appointed to sell the Property at auction to the highest bidder, in accordance with to RPAPL Article 13;
c. The interest of the defendant(s) and all persons claiming by or through them be foreclosed and their title, right, claim, lien, interest or equity of redemption to the Property be forever extinguished;
d. The Plaintiff be paid out of the sale proceeds the amounts due for principal, interest, late charges, taxes, assessments, insurance, maintenance and preservation of the Property, and other similar charges, together with costs, allowances, expenses of sale, reasonable attorney's fees, all with interest, and that the sale proceeds be distributed in accordance with to RPAPL Article 13;
e. The property be sold in as is condition, subject to the facts an inspection or accurate survey of the Property would disclose, covenants, restrictions, easements and public utility agreements of record, building and zoning ordinances and violations, and the equity of redemption of the United States of America;
f. Plaintiff may purchase the Property at the sale;
g. A receiver be appointed for the Property, if requested by Plaintiff;
h. If the Plaintiff possesses other liens against the Property, they not merge with the Mortgage being foreclosed and that Plaintiff, as a subordinate lien holder, be allowed to share in any surplus proceeds resulting from the sale;
i. Awarding the relief requested in the SECOND, THIRD and FOURTH causes of action stated in this complaint; and
j. That the Assignment of Mortgage from ARCPE Holding LLC to Bank of America N.A. dated February 8, 2019 and was recorded on February 12, 2019 in CRFN: 2019000048290 be cancelled and expunged from the record.

   k.  That the Full Discharge of mortgage dated February 28, 2019 and recorded on March 1, 2019 in CRFN: 2019000068627 be cancelled and expunged from the record.

   l.   That the Court award Plaintiff additional relief that is just, equitable and proper.

Dated: November 13, 2019
       New York, New York

                      Hasbani & Light P.C.


                      /s/ Ross Eisenberg
                      Ross Eisenberg, Esq.
                      *Attorneys for Plaintiff*
                      450 Seventh Ave. Suite 1408
                      New York, New York 10123
                      (212)  643-6677

## Schedule A

Attached here as Schedule A is a copy of the original note. If applicable, certain non-public personal information has been redacted from the attached document.

# HOME EQUITY LINE OF CREDIT AGREEMENT
## AND PROMISSORY NOTE
### (SECONDARY MORTGAGE LOAN)

**Borrower's Name and Address:**

Alexander T. Dator
83-17 Britton Avenue
Elmhurst, NY 11373

**Property Serving as Security (the "Property"):**

83-17 Britton Avenue
Elmhurst, NY 11373

**Lender's Name and Address:**

GreenPoint Mortgage Funding, Inc.
100 Wood Hollow Drive, Novato, CA 94945

| | | |
|---|---|---|
| No.:        0092306075 | Initial Advance: $ 96,700.00 | Maturity Date: June 15, 2032 |
| Date:      June 8, 2007 | Minimum Advance: $ 100.00 | Billing Cycle:  Monthly |
| Line of Credit: $ 96,700.00 | Draw Period: 180 Months | Payment Date:  Monthly |
| | Repayment Period: 120 months | |

**NOTICE TO CO-SIGNER: YOUR SIGNATURE ON THIS NOTE MEANS THAT YOU ARE EQUALLY LIABLE FOR REPAYMENT OF THIS LOAN.  IF THE BORROWER DOES NOT PAY, THE LENDER HAS A LEGAL RIGHT TO COLLECT FROM YOU.**

**MINNESOTA BORROWERS:  THIS LINE OF CREDIT SHALL BE GOVERNED BY MINN. STAT. §47.59.**

**PENNSYLVANIA BORROWERS ONLY: THIS AGREEMENT IS SUBJECT TO THE OPEN-END PROVISIONS OF THE SECONDARY MORTGAGE LOAN ACT.**

**NOTICE TO PENNSYLVANIA BORROWERS: THIS AGREEMENT CONTAINS PROVISIONS FOR A VARIABLE INTEREST RATE.**

1. **GENERAL TERMS AND DEFINITIONS.**  This is the Agreement establishing your Home Equity Line of Credit.

   In this Agreement, many of the terms we use have special meanings:

   (a) "You," "your" and "yours" means each and all Borrowers who sign this Agreement and any persons who use the Line of Credit, jointly and severally.

   (b) "We," "us" and "our" means Lender, and its successors and assigns.

   (c) "Account" means the Line of Credit Account established by this Agreement.

   (d) "Billing Cycle" means the period of time normally covered by periodic billing statements and includes such period of time even when a statement is not sent because there is otherwise no balance in your Account for that period.

   (e) "Credit Limit" means the maximum amount of principal shown above that we will ordinarily allow you to owe us at any time under this Agreement.

   (f) "Credit Line Checks" means the checks used to access the Line of Credit funds during the Draw Period.

   (g) "Draw Period" means the period of time shown above during which you can receive advances under this Agreement.

(h) "Initial Advance" means the amount of money we will require you to accept as an advance to open the Account.

(i) "Line of Credit" means the home equity line of credit offered to Borrower by Lender pursuant to the terms of this Agreement.

(j) "Loan Account Balance" means the sum of the unpaid principal of advances made under your Line of Credit, plus unpaid but earned finance charges, plus any costs, expenses, and fees that are due.

(k) "Maturity Date" for Line of Credit is **June 15, 2032**. On this date, you promise to pay any remaining Loan Account Balance.

(l) "Minimum Advance" means the smallest amount of money we will advance to you under this Agreement.

(m) "Minimum Payment" means the minimum payment you must make on the Line of Credit, as reflected on each periodic billing statement Lender will deliver to you for each Billing Cycle.

(n) "Plan" refers to this Home Equity Line of Credit collectively.

(o) "Repayment Period" means the period of time shown above during which you must repay the outstanding balance of your Account, with accrued interest, but may not request further advances. The Repayment Period begins at the end of the Draw Period, and ends on the earlier of the Maturity Date or the date when final payment of the Loan Account Balance has actually been made.

This is a personal line of credit which we are making available to you to obtain loans up to the Credit Limit on the terms and conditions contained in this Agreement. You will be able to obtain such loans from time to time, and in such amounts that we may advance and re-advance to you up to the Credit Limit, subject to the terms of this Agreement.

**2. PROMISE TO PAY; CREDIT LIMIT.** You promise to pay to Lender, or order, the total of all funds which are advanced and re-advanced to you from time to time under this Agreement, plus interest thereon, as set forth below. You also promise to pay Lender, or order, all other amounts, fees, costs and charges you are responsible for under this Agreement and that are permitted or not prohibited by applicable law. You must repay the entire outstanding Loan Account Balance, plus all accrued interest and any fees and charges due and payable on the Account, on or before the Maturity Date shown above. In the event all such sums are not paid on or before the Maturity Date, then interest shall continue to accrue on the Loan Account Balance using the same method of calculating your interest rate as set forth below.

Your Credit Limit is set forth at the beginning of this Agreement. You agree not to allow the principal amount that you owe on the Account to exceed the Credit Limit. If you do exceed the Credit Limit, you will repay the excess immediately.

**3. SECURITY.** All amounts due under the Account are secured by a mortgage, deed of trust, or security deed (the "Security Instrument") on the Property. You agree to pay all amounts due from you, and otherwise perform all covenants and obligations required of you, under the Security Instrument. If it becomes necessary for us to advance funds to you beyond the Credit Limit to protect our security interest, those amounts in excess of the Credit Limit will be owed by you and will be secured by the Security Instrument. The Security Instrument and this Agreement are related documents and a default under one document will be treated as a default under the other document. To the extent permitted by applicable law, the lien of the Security Instrument will continue and will have the same priority of claim if, with your consent, we renew, extend, amend, modify or substitute this Agreement. In the event of such renewal, extension, modification or substitution, you agree to execute any additional documents necessary to accomplish the action being taken.

Property securing any other loans that you have with us may also secure this Agreement.

4.   **LOAN ADVANCES.** We are not obligated to advance any funds to you under this Agreement until: (a) the Security Instrument: (i) has been reviewed by us for accuracy and completeness, (ii) has been recorded in the appropriate land records of the jurisdiction in which the Property is located, and (iii) constitutes a valid lien on the Property, with no other encumbrances on the Property except for any prior mortgage or deed of trust and declarations, easements or restrictions of record listed in a schedule of exceptions to coverage in the title insurance policy insuring Lender's interest in the Property and to which Lender has agreed; and (b) any applicable right of rescission has expired without exercise of that right.

After these conditions have been satisfied, you may obtain advances on your Account by using the Credit Line Checks. You may only write Credit Line Checks during the Draw Period, and only for amounts equal to or greater than the Minimum Advance amount shown above, subject to your Credit Limit. If your request is for less than the Minimum Advance, we may, at our option, grant the request. However, granting the request does not mean we will be required to grant requests for less than the Minimum Advance in the future. We always have the option to deny any such request. During the Draw Period, you may draw upon your Account, within the Credit Limit, until it is terminated or unless additional advances are otherwise prohibited, as provided below. You have the right at any time to limit the maximum amount of indebtedness to be secured by the Security Instrument. We will not honor Credit Line Checks received by us following the expiration of the Draw Period, regardless of whether you issue such Credit Line Checks during the Draw Period. We are not required to honor any request for any transfer or draw that would cause your outstanding indebtedness to exceed your Credit Limit. If we do make the advance, it does not mean that your Line of Credit has been increased. We may require you to repay the amount over your Line of Credit at once.

In the event that the law in the state in which the Property is located places restrictions on the continuing priority of the Security Instrument, the Draw Period will end immediately upon our receipt of notice complying with state law that an event has taken place that will cause future draws not to be secured by the Security Instrument in the same priority as the recorded Security Instrument. Such instances may include: we have been notified by you that you have exercised your right under state law to stop further advances under this Agreement from being secured by the Security Instrument; or we have received notice conforming to applicable state law that a lien has been recorded against the Property that will take priority over the lien of any further draws under the Agreement. You will promptly return to us any checks or other methods of accessing your Account to request Advances in any such event.

We reserve the right to make Loan Advances to protect our rights under the Security Instrument, including but not limited to paying property taxes, homeowners insurance or flood insurance premiums, and reinstating a delinquency in any mortgage loan with priority over the Security Instrument.

5.   **VARIABLE RATE.** The interest rate is variable, and the **ANNUAL PERCENTAGE RATE** (corresponding to a daily periodic rate) and the periodic payment may change. The **ANNUAL PERCENTAGE RATE** (corresponding to a daily periodic rate) includes interest only and not other costs.

6.   **INITIAL INTEREST RATE.** Until **1** month(s) after the funding date (the "Initial Rate Period"), the daily periodic rate of **FINANCE CHARGE** is **0.0144%**, which corresponds to an **ANNUAL PERCENTAGE RATE** of **5.250%**. The periodic rate and corresponding **ANNUAL PERCENTAGE RATE** described above are the initial rates assessed under this Agreement, and are not based on the Index and Margin (defined below) used for later rate adjustments. Had these rates been based on the current Index and Margin, the daily periodic rate of finance charge and **ANNUAL PERCENTAGE RATE** would have been higher. Ask us for the current Index value, Margin, discount, and **ANNUAL PERCENTAGE RATE**. After you open this Line of Credit, rate information will be provided on periodic billing statements that we send you.

7.   **SUBSEQUENT INTEREST RATE.** After the Initial Rate Period and until the Final Maturity Date, the method of calculating your **ANNUAL PERCENTAGE RATE** will change and your interest rate and Minimum Payment may increase. Beginning after the initial rate period, the **ANNUAL PERCENTAGE RATE** (corresponding to a daily periodic rate) will equal the value of an "Index" as of the last publication date of the Index preceding the start of the Billing Cycle plus a "Margin" of **three and one-eighth** percentage points (**3.125%**), rounded to the nearest one-eighth of one percentage point (0.125%). The "Index" is the rate published in The Wall Street Journal under the designation "Money Rates" and shown as "prime rate" or "base rate on corporate loans posted by at least 75% of the nation's 30 largest banks," or substantially similar words.

The **ANNUAL PERCENTAGE RATE** may change on the first day of every month during the term of this Agreement ("Change Date") and the rate will be effective until the ensuing Change Date. The **ANNUAL PERCENTAGE RATE** (corresponding to a daily periodic rate) will not change more than once each Billing Cycle. An increase in the Index will result in an increase in the **FINANCE CHARGE** and corresponding **ANNUAL PERCENTAGE RATE**, which may have the effect of increasing your Minimum Payment. A decrease in the Index will have the opposite effect of an increase. If the Index changes more frequently than the **ANNUAL PERCENTAGE RATE** is scheduled to change, we will always use the Index in effect on the day we adjust the **ANNUAL PERCENTAGE RATE** to determine the new **ANNUAL PERCENTAGE RATE**. In such a case, we will ignore any changes in the Index that occur between **ANNUAL PERCENTAGE RATE** adjustments.

Your maximum **ANNUAL PERCENTAGE RATE** will be 18.000 %. Except for this 18.000 % "cap," there is no limit on the amounts by which the **ANNUAL PERCENTAGE RATE** may increase or decrease on any Change Date or over the life of the Line of Credit.

If the Index becomes unavailable, we will select a new index (and, if necessary, a new margin) that will result in an **ANNUAL PERCENTAGE RATE** (corresponding to a daily periodic rate) that is substantially similar to the rate in effect at the time the original Index became unavailable.

8.    **CALCULATION OF FINANCE CHARGES.** You agree to pay a periodic **FINANCE CHARGE** (which we will refer to as "interest") on your Account based on the **ANNUAL PERCENTAGE RATE** (corresponding to a daily periodic rate) derived in accordance with Sections 6 and 7. The **FINANCE CHARGE** begins to accrue on the day that your Account has been debited for each advance, and continues to so accrue until the day the outstanding Loan Account Balance is paid in full.

To determine the **FINANCE CHARGE** for a Billing Cycle, we apply a daily periodic rate of **FINANCE CHARGE** to the balance of your Loan Account Balance each day ("Daily Balance") during the Billing Cycle. To determine the daily periodic rate, we divide the **ANNUAL PERCENTAGE RATE** (corresponding to a daily periodic rate) in effect for the Billing Cycle by 365. To obtain the Daily Balance, we take the unpaid balance of your Account at the beginning of each day, add any new advances and other debits, except late charges, credit insurance premiums and returned check fees, and subtract payments or credits and unpaid finance charges. This results in your daily principal balance for each day in the Billing Cycle. We then determine the **FINANCE CHARGE** for each day by multiplying the Daily Balance for such day by the daily periodic rate. These daily finance charges are added together to obtain the total periodic **FINANCE CHARGE** for the period covered by the Billing Cycle.

9.    **ADDITIONAL FINANCE CHARGES:** You agree to pay us the following additional **FINANCE CHARGES:**

   *    See Fee Schedule

10.    **MONTHLY PAYMENTS.**
(A.) **DRAW PERIOD.** Each month, we will send you a periodic statement applicable to your Account. You must pay us at least the Minimum Payment indicated on the periodic statement by the date indicated on the statement. If, however, the unpaid balance in your Account is less than the Minimum Payment, your Minimum Payment will be equal to the balance in your Account. The Minimum Payment will include (a) late charges and any other charges authorized by this Agreement, including, without limitation, any expenses or advances incurred by us under the Security Instrument; (b) current **FINANCE CHARGES** and accrued but unpaid **FINANCE CHARGES** for prior Billing Cycles; (c) premiums for any optional credit life insurance you may decide to obtain through us; and (d) an amount equal to the amount by which your Loan Account Balance exceeds your Credit Limit. If, however, the unpaid balance in your Account is less than the Minimum Payment, your Minimum Payment will be equal to the balance in your Account.

You can pay off all or any part of what you owe at any time. However, so long as you owe any amount, you must continue to make the Minimum Payment. During the Draw Period the Minimum Payment will not reduce the principal outstanding on your Line of Credit.

**(B.) REPAYMENT PERIOD.** During the Repayment Period, the Minimum Payment will be an amount equal to the accrued and unpaid finance charges, late charges and other charges authorized by this Agreement, including, without limitation, any expenses or advances incurred by us and under the Security Instrument, plus **0.8333%** of the Loan Account Balance outstanding at the end of the Draw Period. During the Repayment Period, payment of the Minimum Payment only may not fully repay your Loan Account Balance. If paying the Minimum Payment will neither reduce nor fully repay your Loan Account Balance, you will then be required to pay the entire balance in a single balloon payment on the Maturity Date shown above. We are not obligated to refinance any portion of that indebtedness, but will consider your request to do so. You must be prepared to repay the full amount due upon the expiration of this Agreement. If you refinance this Account at maturity, you may have to pay some or all of the closing costs normally associated with a new loan even if you obtain financing from us.

**11. APPLICATION OF PAYMENTS.** We will apply all payments which we receive from you in the following order: to pay (a) amounts due under the Security Instrument to secure the amounts advanced under your Account and to protect our security; (b) any escrow payments, if we require such payments under the Security Instrument; (c) any late charges; (d) any other fees and charges other than finance charges; (e) accrued and unpaid finance charges; and (f) any unpaid principal balance.

**12. PREPAYMENT.** You may repay all or any part of your outstanding Loan Account Balance, at any time, without penalty. During the Draw Period, any amounts that you repay will subsequently be available to you for advances, subject to your Credit Limit and other limitations in this Agreement. However, so long as you owe any amount you must continue to make your periodic Minimum Payment. Even if the entire outstanding Loan Account Balance has been repaid, the Account will remain open for future advances during the Draw Period, until you or your agent instructs us in writing to close the Account. The Security Instrument will remain in effect for all such future advances under your Account.

**13. ADDITIONAL REPAYMENT TERMS.** If you fail to make a payment, we may, but are not required to, advance money to you to make the payment. All of the terms of this Agreement would apply to such an advance.

You can pay off all or part of what you owe at any time. However, so long as you owe any amount you must continue to make your periodic Minimum Payment. Even if you pay more than the Minimum Payment, this does not affect your obligation to pay at least the Minimum Payment on subsequent payment due dates.

**14. SET-OFF.** You agree that we may set-off any amount due and payable under the terms of this Agreement against your right to receive money from us, unless prohibited by applicable law. For example, our right of set-off does not apply to an Individual Retirement Account; other tax-deferred retirement accounts; or federal benefit, wage, salary and retirement payments held in an electronic transfer account (ETA). In addition, our right of set-off does not apply to an account or other obligation if your rights arise only in a representative capacity or if you can obtain credit under this Agreement by using a credit card.

Your right to receive money from us includes any deposit or share account balance you have with us; any money owed to you on an item presented to us or in our possession for collection or exchange; and any repurchase agreement or other non-deposit obligation. "Any amount due and payable under the terms of this Agreement" means the total amount which we are entitled to demand payment of under the terms of this Agreement at the time we set-off.

**15.    CHANGING THE TERMS OF THIS AGREEMENT.** Generally, we may not change any term of this Agreement. However, we may change a term in the following circumstances:  (a) we may prohibit additional extensions of credit or reduce your credit limit during the period that the maximum **ANNUAL PERCENTAGE RATE** is reached; (b) we may make specified changes that you have specifically agreed to in writing; (c) we may make changes that unequivocally benefit you throughout the remainder of the Plan; (d) we may make insignificant changes to the terms of this Agreement; or (e) if this is a variable rate plan, we may change the Index and Margin if the original Index described in this Agreement is no longer available. Any new index will have a historical movement similar to the original Index, and, together with a new margin, will result in an interest rate substantially similar to the rate in effect at the time the original Index became unavailable.

If we are required to send notice of a change in terms, we will send the notice to your address listed in this Agreement.

**16.    ADDITIONAL CHARGES.**  You agree to pay the following additional charges pursuant to your Line of Credit:

- Late Fee.  If your payment is more than **15** days late, a late charge of **2.000%** of the overdue payment of principal and interest will be assessed**, but not less than U.S. $0.00 and not more than U.S. $N/A.**

- Annual Membership Fee.  An annual fee of **$75.00** for each twelve-month period during the Draw Period.  This fee will be added to your Loan Account Balance on a yearly basis;

- Returned Check Fee. A fee of **$20.00** for any check that you have issued in connection with this Plan that is returned dishonored;

- Stop Payment Fee.  A fee of $10.00 for each Credit Line Check that you issue for which you order us to stop payment;

- A Termination Fee of $0.00 will be charged.

- (Other) See Fee Schedule.

**17.    INSURANCE.**  You must maintain on the Property a homeowner's policy of casualty and liability insurance and flood insurance, if applicable, in such amount(s) and for such period(s) of time as we may require.  To open your Account, you must provide us with written proof, such as a current certificate of insurance, showing the required insurance coverage on the Property, as well as an endorsement of such policy in favor of us.  In addition, the policy must require that your insurance company provide us with at least fifteen (15) days written notice of any change in insurance coverage or of cancellation of your policy.  We may refuse to honor checks or to make other advances or transfers of funds under the Account until we receive satisfactory evidence with respect to these items.  You may purchase insurance from anyone you want who is acceptable to us.  The Security Instrument more fully describes your insurance obligations.

**NOTICE TO ILLINOIS, MISSOURI AND OREGON BORROWERS: Unless you provide us with evidence of the insurance coverage required by your agreement with us, we may purchase insurance at your expense to protect our interests in your collateral.  This insurance may, but need not, protect your interests.  The coverage that we purchase may not pay any claim that you make or any claim that is made against you in connection with the collateral.  You may later cancel any insurance purchased by us, but only after providing us with evidence that you have obtained insurance as required by our agreement.  If we purchase insurance for the collateral, you will be responsible for the costs of that insurance, including interest and any other charges we may impose in connection with the placement of the insurance, until the effective date of the cancellation or expiration of the insurance.  The costs of the insurance may be added to your total outstanding balance or obligation.  The costs of the insurance may be more than the cost of insurance you may be able to obtain on your own.**

18.   **TERMINATION AND ACCELERATION. DEFAULT IN THE PAYMENT OF THIS LOAN AGREEMENT MAY RESULT IN THE LOSS OF THE PROPERTY SECURING THE LOAN. UNDER FEDERAL LAW, YOU MAY HAVE THE RIGHT TO CANCEL THIS AGREEMENT. IF YOU HAVE THIS RIGHT, THE CREDITOR IS REQUIRED TO PROVIDE YOU WITH A SEPARATE NOTICE SPECIFYING THE CIRCUMSTANCES AND TIMES UNDER WHICH YOU CAN EXERCISE THIS RIGHT.** You will be in default of this Agreement, and we can terminate your Account and require immediate payment of the entire outstanding Loan Account Balance, plus accrued interest and other charges if any of the following occur: (a) you engage in fraud or material misrepresentation in connection with any phase of this Line of Credit; (b) you fail to meet the repayment terms of this Agreement for any outstanding balance; or (c) your action or inaction adversely affects the Property, our security interest or any other right that we have in the Property, including, but not limited to: (i) failure to maintain required insurance on the Property; (ii) the sale, transfer, conveyance, or encumbrance of the Property in violation of the Security Instrument; (iii) failure to maintain the Property or use of the Property in a destructive or illegal manner; (iv) commission of waste; (v) failure to pay taxes on the Property or otherwise act or fail to act and thereby cause a lien to be filed against the Property that is senior to the lien of the Security Instrument; (vi) your death, if you are solely obligated under this Agreement, or if the death of one of several Borrowers under this Agreement causes our security to be adversely affected; (vii) the Property is taken through eminent domain; (viii) a judgment is filed against you and subjects you and the Property to action that adversely affects our interest; (ix) a prior lienholder forecloses on the Property and as a result, our interest is adversely affected; or (x) you move out of the dwelling and our security interest is thereby adversely affected. The Security Instrument also describes how and under what conditions you may be required to make immediate payment of the entire outstanding Loan Account Balance, plus accrued interest and other charges you owe under this Agreement. Some of those conditions are described as follows:

> **Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

> If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by applicable law.

> If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

19.   **REMEDIES.** Subject to applicable law, we may terminate your Line of Credit, require you to pay the entire outstanding Loan Account Balance in one payment, charge you a termination fee (if provided for in this Agreement), and charge you any other fees related to the collection of the amount owing if you are in default in any manner described above. Furthermore, to the extent permitted by applicable law, in that instance we may also take any other action short of termination, such as charging you a fee if you fail to maintain required property insurance and we purchase insurance. If you fail to pay the Loan Account Balance after notice and demand thereof, and as required by applicable law, we may foreclose the Security Instrument and sell the Property. We can elect to exercise or delay enforcement of any of our rights under this Agreement and/or the Security Instrument without losing any such rights. If we elect not to exercise or enforce any of our rights, such election shall not be deemed a waiver of any of those rights. If we elect to terminate this Plan and accelerate the amounts owing on your Account, we may use our right to set-off, unless prohibited by applicable law.

**20.    SUSPENSION OF CREDIT AND REDUCTION OF CREDIT LIMIT.**  We may temporarily prohibit you from obtaining additional advances or reduce your Credit Limit during any period in which: (a) the value of the dwelling that secures this Line of Credit declines significantly below the dwelling's appraised value for purposes of this Plan; (b) we reasonably believe you will not be able to fulfill the repayment obligations because of a material change in your financial circumstances; (c) you are in default of any material obligation of this Agreement, or any agreement securing this Agreement; (d) a government action prevents us from imposing the Annual Percentage Rate provided for in this Agreement; (e) the priority of our security interest is adversely affected by a government action to the extent that the value of the security interest is less than 120% of the Line of Credit; (f) the Annual Percentage Rate corresponding to the daily periodic rate reaches the maximum rate allowed under this Agreement; or (g) we have been notified by a regulatory agency that continued advances constitute an unsafe and unsound business practice.

In the event that we suspend your right to additional advances or reduce your Line of Credit, we will send you notice of our decision to do so at the address listed in this Agreement. If we have based our decision to suspend or reduce your credit privileges on an assessment of your financial condition or performance under this Plan and you believe that your situation has changed, you must request that we re-evaluate your situation in order to reinstate your privileges.

**21.    FINANCIAL AND CREDIT INFORMATION.** You will promptly provide us with personal financial information, including a financial statement, if we should request it for the purpose of reviewing your Account or updating your credit file. We may request such information from time to time, whether or not we have reason to believe that there are any problems with your Account or with your creditworthiness. Any advances or transfers made under the Account are made in reliance upon the information that you provide us, which you represent and warrant to us is true and accurate as of the date such information is given. You authorize us to make or have made any credit inquiries we feel are necessary. You also authorize the person or agencies to whom we make these inquiries to supply us with the information we request.

**If the Property is located in California, you are hereby notified in accordance with California law that a negative credit report reflecting on your credit record may be submitted to a credit reporting agency if you fail to fulfill the terms of your credit obligations.**

**22.    ATTORNEY FEES AND OTHER COLLECTION COSTS.**  If you default on this Agreement, you agree to pay all our reasonable attorneys' fees (not in excess of 10% of the principal amount due plus accrued unpaid interest if the property is located in Arkansas or 15% of the unpaid debt if the property is located in Colorado, Kansas, Missouri, New York, Oklahoma or South Carolina), that we incur if this debt is referred for collection to an attorney other than a salaried employee of ours, together with all other costs of collecting the debt not prohibited by applicable law. If the property is located in New Hampshire and if a court finds that section 361-C:2 of the New Hampshire Revised Code applies, then in the event that you prevail in any action, suit or proceeding brought by us or in any action brought by you, reasonable attorney fees may be awarded to you; further, if you successfully assert a partial defense or set-off, recoupment or counterclaim to an action brought by us, a court may withhold from us the entire amount of such portion of its attorneys' fees as the court shall consider equitable. In New Jersey, you must pay our attorney fees under the following conditions: (a) they are paid to an attorney authorized to practice law in this state; (b) such attorney is not a partner, officer, director or employee, whether salaried or commissioned, of ours; and (c) the suit to collect must be actually filed by the attorney and subsequently decided in our favor, in which case the attorney's fees shall not exceed 15% of the first $500, 10% of the next $500, and 5% of any excess due and owing under this Agreement and further provided that we provide you with the appropriate notice of suit as required by applicable law.

**23.    GOVERNING LAW AND ENFORCEABILITY.** Federal law applies to certain aspects of this Agreement. This Agreement will be governed by the laws of the jurisdiction in which the Property is located, except to the extent federal law applies. If any part of this Agreement is determined to be invalid, then we may enforce the remainder of this Agreement as if the invalid provision did not exist. If the real property securing this Agreement is located in Maryland and this Agreement is secured by a mortgage that is junior in priority to another mortgage, Title 12, Subtitle 9 of the Commercial Law Article of Maryland statutes shall govern this Agreement. If a federal law allows the imposition of a higher **FINANCE CHARGE** or other fee or charge than is allowed by Maryland law, the federal law shall apply. If the real property securing this Agreement is located in Kansas, we agree that this Agreement is made subject to the Kansas Uniform Consumer Credit Code.

24.    **TERMINATION OF AGREEMENT.** Your Account will automatically terminate on the earlier of the Maturity Date shown above or on the date we give you notice of the termination as the result of an occurrence of a default (as described in Section 18). Upon termination of the Account, the entire Loan Account Balance then outstanding, with accrued interest and any fees and charges owing on the Account, will be due and payable in full on that date. You can terminate this Agreement by written notice of termination of this Agreement and a request for a discharge of the Security Instrument mailed or delivered to us at any time. Your notice of termination will be effective on the first business day after we receive it and the entire principal balance outstanding on your Account, plus interest accrued thereon, together with fees and charges owing on the Account, will be due and payable in full on that date.

25.    **JOINT AND SEVERAL LIABILITY; TERMINATION OF ACCOUNT.** If this Account is jointly held, each of you authorizes any other Borrower, on his or her request alone and without the consent or knowledge of the other(s), to cancel the Line of Credit, to request and receive advances of principal under your Line of Credit Account, to take any action or to give or receive any notice under this Agreement, and to take all other actions in connection with this Agreement. In addition, any notice given by us to one of you shall be effective as to all of you. In any event, each of you will be legally responsible for payment of the total amount of the Loan Account Balance and applicable charges. regardless of any divorce, legal separation or other legal proceedings.

26.    **NOTICES.** We will mail statements and notices to you at the address set forth above. You must notify us in writing of any change in your name, address, or place of employment. You may send written notices to us at the address set forth above or at such other address that we designate in writing.

27.    **REPRESENTATIONS AND WARRANTIES.** You represent and warrant to us that the information contained in the loan application, in each material respect, was true at the time the loan application was completed. You represent and warrant to us that the terms of any existing deed of trust, mortgage, or security deed on the Property permit us to enter into this Agreement and that the loans secured by such existing deed of trust, mortgage, or security deed are current in all material respects and are not in default.

28.    **TAX DEDUCTIBILITY.** You acknowledge that we (including our employees and representatives) do not make any representations or warranties to you about the tax consequences of you establishing or using this Line of Credit (including the deductibility of interest or fees), and we will not be liable if interest or fees are not deductible. You should consult a tax advisor regarding the deductibility of interest, charges, and fees under this Agreement.

29.    **TITLE INSURANCE AND MORTGAGE RECORDING TAX.** The cost of title insurance and the mortgage recording tax shall be based on the maximum amount of the Line of Credit available to you, whether advanced or not.

30.    **BILLING ERRORS.** Your rights and responsibilities with regard to billing errors are explained in the document under the heading "YOUR BILLING RIGHTS," which is attached to this Agreement.

31.    **LOAN CHARGES.** If the Account is subject to a law that sets maximum loan charges, and that law is finally interpreted so that the interest or other charges collected, or to be collected, in connection with the Account exceeds the permitted limits, then: (i) any such charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (ii) any sums already collected from you which exceeded permitted limits shall be refunded to you. We will refund the excess either by reducing the principal owed under the Account or by making a direct payment to you. If we apply the excess toward reducing the principal balance, the reduction will be treated as a partial prepayment.

32.    **ASSIGNS.** This Agreement shall be binding upon you and each of your heirs, executors, administrators, successors and assigns, subject to the limitations on selling, transferring or otherwise conveying the Property contained in this Agreement and the Security Instrument.

33.    **WAIVERS.** To the extent not prohibited by law and subject to any required notice and opportunity to cure a default for failure to make a required payment, you waive protest, presentment for payment, demand, notice of dishonor, notice of acceleration, notice of intent to accelerate, and notice of nonpayment.

34.    **TERMINATION FEE.** To the extent permitted by applicable law, you will be charged a Termination Fee if this Line of Credit is closed and reconveyed within the first 36 months after the Account is established.

35. **NOTICE TO MISSOURI BORROWERS ONLY.** Oral agreements or commitments to loan money, extend credit or to forbear from enforcing repayment of a debt including promises to extend or renew such debt are not enforceable. To protect you (borrower(s)) and us (creditor) from misunderstanding or disappointment, any agreements we reach covering such matters are contained in this writing, which is the complete and exclusive statement of the agreement between us, except as we may later agree in writing to modify it.

36. **VIRGINIA HOMESTEAD WAIVER.** I (or we) waive the benefit of my (or our) exemption as to this obligation.

37. **MARYLAND RECORDATION TAX.** If the security instrument securing this Agreement is subject to the recordation tax under Title 12 of Maryland statutes, you may, at your option, pay the recordation tax on your entire Line of Credit amount at closing, or you may pay the required tax on the amount of each advance at the time you obtain each advance. If you elect to pay the recordation tax as advances are made to you, you will have seven days from the date of the advance to file with the clerk of the court where the security instrument is recorded a verified statement of the amount of the advance. You will be responsible for paying the clerk the amount of the applicable recordation tax at that time as well as any other fees the clerk may impose. If you fail to do so, you may be penalized as provided in section 14-1012 of the Tax-Property Article of the Maryland statutes.

By executing this Agreement, you acknowledge that you have read this Agreement and that you agree to its terms and conditions. You also acknowledge that each person owning an interest in the Property has received a copy of this Agreement and two copies of the Notice of Right to Cancel, if applicable.

**NOTICE TO NEW JERSEY SECONDARY MORTGAGE LOAN BORROWERS: READ THIS PROMISSORY NOTE BEFORE YOU SIGN. DO NOT SIGN THIS PROMISSORY NOTE IF IT CONTAINS BLANK SPACES. THIS PROMISSORY NOTE IS SECURED BY A SECONDARY MORTGAGE LOAN ON YOUR REAL PROPERTY.**

**NOTICE TO OREGON BORROWERS: DO NOT SIGN THIS AGREEMENT BEFORE YOU READ IT. THIS AGREEMENT PROVIDES FOR THE PAYMENT OF A PENALTY IF YOU WISH TO REPAY THE LOAN PRIOR TO THE DATE PROVIDED FOR REPAYMENT IN THIS AGREEMENT.**

**NOTICE TO IOWA BORROWERS: IMPORTANT: READ BEFORE SIGNING. THE TEMS OF THIS AGREEMENT SHOULD BE READ CAREFULLY BECAUSE ONLY THOSE TERMS IN WRITING ARE ENFORECEABLE. NO OTHER TERMS OR ORAL PROMISES NOT CONTAINED IN THIS WRITTEN CONTRACT MAY BE LEGALLY ENFORCED. YOU MAY CHANGE THE TERMS OF THIS AGREEMENT ONLY BY ANOTHER WRITTEN AGREEMENT.**

**CAUTION - IT IS IMPORTANT THAT YOU THOROUGHLY READ THE CONTRACT BEFORE YOU SIGN IT.**

| | |
|---|---|
| _____ (Borrower) | _____ (Borrower) |
| Alexander T. Dator | |
| _____ (Borrower) | _____ (Borrower) |
| _____ (Borrower) | _____ (Borrower) |
| _____ (Borrower) | _____ (Borrower) |

Lender: **GreenPoint Mortgage Funding, Inc.**

By: _____

Title: **Brad Cooke**
**Vice President**

## OUR BILLING RIGHTS
## KEEP THIS NOTICE FOR FUTURE USE

This notice contains important information about your rights and our responsibilities under the Fair Credit Billing Act.

*Notify Us In Case of Errors or Questions About Your Bill*

If you think your bill is wrong, or if you need more information about a transaction on your bill, write us at the address listed on your bill. Write to us as soon as possible. We must hear from you no later than 60 days after we sent you the first bill on which the error or problem appeared. You can telephone us, but doing so will not preserve your rights. In your letter, give us the following information:

- Your name and account number.

- The dollar amount of the suspected error.

- Describe the error and explain, if you can, why you believe there is an error. If you need more information, describe the item you are not sure about.

If you have authorized us to pay your bill automatically from your savings, checking, share draft or other account, you can stop the payment on any amount you think is wrong. To stop payment your letter must reach us three business days before the automatic payment is scheduled to occur.

### *Your Rights and Our Responsibilities*
After We Receive Your Written Notice

We must acknowledge your letter within 30 days, unless we have corrected the error by then. Within 90 days, we must either correct the error or explain why we believe the bill was correct.

After we receive your letter, we cannot try to collect any amount you question, or report you as delinquent. We can continue to bill you for the amount you question, including finance charges, and we can apply any unpaid amount against your credit limit. You do not have to pay any questioned amount while we are investigating, but you are still obligated to pay the parts of your bill that are not in question.

If we find that we made a mistake on your bill, you will not have to pay any finance charges related to any mistaken amount. If we didn't make a mistake, you may have to pay finance charges, and you will have to make up any missed payments on the questioned amount. In either case, we will send you a statement of the amount you owe and the date that it is due.

If you fail to pay the amount that we think you owe, we may report you as delinquent. However, if our explanation does not satisfy you and you write to us within ten days telling us that you still refuse to pay, we must tell anyone we report you to that you have a question about your bill. We must tell you the name of anyone we reported you to. We must tell anyone we report you to that the matter has been settled between us when it finally is.

If we don't follow these rules, we can't collect the first $50 of the questioned amount, even if your bill was correct.

# Fee Schedule

| ADDITIONAL FINANCE CHARGES | | ADDITIONAL OTHER CHARGES | |
|---|---|---|---|
| Description | Amount | Description | Amount |
| Origination Fee to Broker | $1,208.75 | Title Endorsement | $75.00 |
| Discount Points | $483.50 | Recording Fees | $250.00 |
| Application Fee to GPM | $130.00 | New York Mtg Tax | $1,710.60 |
| Attorney Fees | $400.00 | | |

In addition to the **Finance Charges** listed above, any additional **Finance Charges** listed on the HUD-1 settlement statement executed by you and of even date herewith, is hereby incorporated herein by reference and made a part hereof.

In addition to the Other Charges listed above, any additional Other Charges listed on the HUD-1 settlement statement executed by you and of even date herewith, is hereby incorporated herein by reference and made a part hereof.

**GreenPoint Mortgage Funding, Inc. will be paying the Broker for services provided in this transaction in the amount of $ 0.00**

WITHOUT RECOURSE
PAY TO THE ORDER OF:

GreenPoint Mortgage Funding, Inc.

Larry R. Kern
Assistant Vice President

## Schedule B - Legal Description

**ADVANTAGE FORECLOSURE SERVICES, INC.**

**Title No.  FCL-139131-18 (File No. 18-005724)**

**SCHEDULE A
DESCRIPTION**

**Block 1508 and Lot 62**

ALL that certain plot, piece or parcel of land, with the buildings and improvements thereon erected, situate, lying and being in the Second Ward, Borough and County of Queens, City and State of New York, bounded and described as follows:

BEGINNING at a point on the Northwesterly side of Britton Avenue, distant 24 feet Southwesterly from the corner formed by the intersection of the Northwesterly side of Britton Avenue with the Southwesterly side of Ketcham Street;

RUNNING THENCE Northwesterly parallel with Ketcham Street, 100 feet;

THENCE Southwesterly parallel with Britton Avenue, 26 feet;

THENCE Southeasterly again parallel with Ketcham Street, 100 feet to the Northwesterly side of Britton Avenue;

THENCE Northeasterly along the Northwesterly side of Britton Avenue, 26 feet to the point or place of BEGINNING.

**Premises known as 83-17 Britton Avenue, Flushing a/k/a Elmhurst, New York**

**Schedule C-Defendants**

9Q4U5E LLC                              Owner of Record

Alexander Dator                         Borrower

Chase Manhattan Mortgage Corp.          Holder of a judgment

Discover Bank                           Holder of a judgment

Bank of America                         Satisfaction filed on its behalf

John Doe                                Those unknown tenants,
                                        occupants, persons or corporations
                                        or their heirs, distributees, executors,
                                        administrators, trustees, guardians,
                                        assignees, creditors or successors
                                        claiming an interest in the mortgaged
                                        premises.)

**Schedule D-Defendants**

New York City Environmental Control Board          Holder of a lien, see attached

```
   Search Parameters- CORP:9q4

   END RETURNS
   *****************************************************************

   (Environmental Control Board (Fire and Building) - Ending Date 06/30/18)

   Search Parameters- CORP:9q4

   9Q4U5E LLC
   83-17 BRITTON AVENUE
   ELMHURST, NY 11373
   ECB Violation No.: 44374077Z         Date-07/18

   Amt: $300.00
   ------------------------------------------------------------------
   END RETURNS
   *****************************************************************

   TAB - (Transit Adjudication Bureau - from 07/14/1998 to 07/20/18)

   Search Parameters- CORP:9q4

   END RETURNS
   *****************************************************************
```